The clerk of the Supreme Court of the second circuit had been requested to issue an execution on a judgment between these parties, rendered in the Supreme Court, without the indorsement required by the Act of 1819, ch. 19. On his refusal to do so the Court was moved to order their clerk to grant the execution, disregarding the said Act as being unconstitutional.
Haywood, J.
delivered the opinion of himself and Emmerson, J.
The Act of 1819, ch. 19, directs that, upon any judgment thereafter to be obtained, execution shall'not issue until two years after the rendition of such judgment, unless the plaintiff shall indorse upon the execution that the sheriff or other officer shall and may receive, in satisfaction of said execution, notes on the State bank of Tennessee and its branches, and the ' Nashville bank and branches, or any of them, and such other notes as pass at par with them, &c.
The same or a similar provision is made by a law of 1820 for forming a new bank and for loaning out the moneys that it may issue. These acts of the Legislature are urged to be unconstitutional and void. And various clauses of the State constitution and of the Constitution of the United States are said to be in direct repugnance to these Acts; and, if so, it is well to admit in the outset that the Acts, like every other act whose basis is authority, are void if the authority be not given. We will take up these several clauses one after another, and examine each in its turn, to discover whether the Acts in question are really unconstitutional, as they are alleged to be.
First, then, let us take into consideration Art. 1, § 10, of the Constitution of the United States: “ No State shall, &c. emit bills of credit or make anything but gold and silver coin a tender in payment of debts, pass any, &c., ex post facto law, or law impairing the obligation of contracts,” &c. The first two sentences respect tender laws and paper money; the construction to be put on them should repress and prevent the evils they were intended to obviate ; and what these are, must be understood by the actual evils which paper money and tender laws produced in the time of the colonial governments; in time of the war of the revolution and after that war, before the adoption of the Constitution of the United States ; and also by the effects which these clauses produced after the adoption of *3 the Constitution; and then by considering what will be the effect of the act of Assembly now under contemplation should the same be deemed valid, we shall be able to discover whether these effects are the ones intended to be prevented by the clauses of the Constitution in question.
"What, then, is the history of paper money and tender laws under the colonial governments. North Carolina issued paper money in 1718, £ 8,000, and the money depreciated. The lords proprietors would not receive it for quit rents, though issued tb defray the expenses of the Tuscarora war. It could not be remitted to England, they said, at the same time peltry was received by them. The next North Carolina emission was in 1722, £ 1,200 ; the next in 1729, £ 40,000 ; the next in 1734, £ 1,000; treasury notes in' 1756, 1757, 1758, and 1759 ; one emission in 1760, of £ 12,000 ; one in 1761, of £20,000; one in 1771, of £ 60,000, to defray the expenses of suppressing the regulators. At this time there was already afloat £ 75,000. In 1729 the money depreciated and could never be raised to its original value. In 1780 the depreciation was three and a half for one; in 1785 it was five for one ; in 1739 it was seven and a half for one ; in 1740 it was received -in payment for taxes at the rate of seven and a half for one, and thus the government redeemed and got clear of it. The Treasury notes-depreciated. There is no instance of paper money which did not depreciate, let the plan for sustaining its credit be of whatever description it might. Paper money, in the time of the colonial governments, was issued in most of the provinces, and in some of them depreciated more than it did in North Carolina. 1
The attempt was made in Massachusetts to issue bank bills, loaning them out on interest and on real and personal security, tobe redeemed gradually by the payment from the borrowers of one twelfth, making the bills a tender, and the refusal of them to incur the loss of the debt. These provisions did not delay the depreciation for one instant. The rate of exchange in the first year was 150 and in the second 200 per cent. In 1729 Massachusetts, Rhode Island and Connecticut had issued paper money. It depreciated. There was an immense quantity afloat, but the people still clamored for more. Massachusetts and New Hampshire were restrained from further emissions by royal instructions to the Governors. Rhode Island could not be restrained because she chose her own Governor, and she issued £ 100,000. It instantly depreciated from 19 to 27 shillings per ounce silver, the former being the settled value before the emission. In 1741, in Massachusetts, the paper money being about to be redeemed by gold and silver remitted from England to reimburse the colonies for the exertions made in the late war above her quota, an apprehension of the scarcity of money and consequent distress of individuals excited a great uneasiness in the colony ; a bank was forthwith proposed to supply the place of the paper money thus to be redeemed. Every borrower was to mortgage a real *4 estate in proportion to the sums he should take from the bank, or, at his option, give personal security when the sum should exceed £100, to pay annually three per centón the sum borrowed, and four percent of the principal. To prevent the general confusion which was anticipated from this institution the Parliament interfered and suppressed the company. The Massachusetts currency was redeemed at the rate of 50 shillings per ounce of silver, instead of 19 shillings per ounce, the rate at which it was issued. At this time the popular leaders were uring theft' best endeavors to make further emissions. In 1722 Pennsylvania issued paper money accompanied with penalties enacted against those who made any difference in the price of their goods when sold for paper and when sold for gold and silver. Notwithstanding this regulation, £130 of the paper was only equal in the course of exchange with Great Britain to £100 sterling, and in some of the colonies £ 100 sterling was equal in value to £ 1,100 currency. Such was the state of the currency before the revolution. During the revolutionary war emissions were made from time to time. Depreciation began in March, 1777, at one and a quarter for one, and progressed to January, 1782, when it was 800 for one; and, as if ashamed of their own loss of credit, the notes silently withdrew from circulation.
After the war of the revolution was ended in 1783, the Assembly emitted in North Carolina £100,000, and in 1785 they made another emission to the same amount. The uniform fate of these emissions was depreciation. The emission of 1783 in North Carolina, depreciated from 8 to 10s. and then 12s. per dollar. The new emission of 1785 still further depreciated to 14, 15, and 16 shillings per dollar, instead of continuing at 8s. per dollar, but returned and settled at 10 on the adoption of the Constitution of the United Slates in 1789, and so it has ever since remained. In the debates in the Convention of North Carolina upon the paper money and tender laws, it was stated that paper in Rhode Island had depreciated eight for one, and one hundred per cent, or 16s. per dollar in North Carolina. It was also stated that Pennsylvania had issued paper money but had not made it a tender; that in South Carolina their bills were a tender, as was also the paper money in Rhode Island, New York, New Jersey, and North Carolina. It was further stated, that in South Carolina laws had been passed to pay debts with land, and from calling them pine barrens it is implied with such land as the debtor might choose to offer. And further, it was stated that they had ordered debts to be paid by instalments.
One cause of depreciation is that the paper could not be remitted to foreign countries. No matter how small the emission may be, it is not equal to gold and silver. He who exchanges it for gold and silver must give a greater quantity of paper. The expense of searching for and finding the silver, of procuring the exchange and of getting it to the plac.e of exportation, together with the risk of conveyance and the greater danger *5 of having the paper money counterfeited, are all considered and involved in fixing the difference of value, and contribute to the increase of depreciation. If the paper money cannot be redeemed till some years hence, that becomes another cause of depreciation. It may be alleviated by an accrual of interest for the delay, but it will nevertheless depreciate from this cause in conjunction with others. £100 in gold and silver is better than £100 bearing interest payable at the end of ten years, although it will then be certainly paid; because, a present and pressing demand, which cannot be extinguished but by gold and silver, makes it eligible sometimes to give a greater premium than the interest rather than abide the consequence of non-payment. And it will take the notes, and a premium besides, to procure the £100 which, perhaps, a merchant wants to pay a foreign creditor who has called for payment.
Another cause of depreciation is the power in the Legislature to repeat emissions at pleasure. For hence arises the just apprehension that repeated emissions will be resorted to. Experience proves that paper money will be issued whenever the cry can be raised of general and public distress, and can cause an application to be made for relief.
With respect to the disorders produced by paper money and tender laws, both theory and experience present them to view. Who will be so imprudent as to give credit to the citizens of a State that makes paper money a tender, and where he can be told, take for a gold and silver debt depreciated paper, depreciating still more in the moment it is paid ? Who would trust the value of his property to the citizens of another State or of his own State, who can be protected by law against the just demands of .creditors by forcing them to receive depreciated paper, or to be delayed of payment from year to year until the Legislature will no longer interfere? Had he not better go to other markets beyond the limits of the State to dispose of his surplus productions ? Or had he not better refrain from making any such surplus productions rather than be compelled to receive from the purchasers of them less than one half the value agreed to be paid for them ? Had he not better remove to another country, where good faith is preserved, with all his property and there accumulate the rewards of his industry, rather than be continually deprived of a great part of them here to suit the convenience of the purchaser ? Would it not be better for a foreign State, whose citizens are thus injured, to use violence and make reprisals rather than suffer such injustice ?
If such are the evils which theory would lead us to anticipate, they are not less formidable under the test of experience. Depreciated paper prevented equal contributions from the States to the general expenses of the nation. New York, for instance, had emitted bills of credit. In them her quota was payable, and by depreciation, of inferior value to the quota of other States where money was not depreciated, though the quotas of *6 the latter' were of much smaller denomination. Impressions had been made, on the public morals by depreciated paper. Purchasers on credit had derived great gains from depreciation, extensive purchases had been, made, and at length the hopes of the purchasers were disappointed, and great numbers of the people were found to owe debts which they were unable to pay ; a general discontent ensued with the course of trade ; petitions were made for relief; embarrassments daily became more extensive, and two parties were formed. One struggling for the observance of public and private engagements, and for the relief of individual distress; they urged recourse to frugality and industry, and that the idle should not be protected by the Legislature from the consequence Of their indiscretion,- and should be restrained from involving themselves in difficulties by the conviction that a rigid compliance with contracts would be enforced. This party was for enlarging the powers of Congress- to effectuate these ends.
The other party pressed for indulgence to debtors and for less rigor in the exact execution of contracts ; for relaxing the administration of justice ; for affording facilities for the payment of debts ; for suspending the collection of them, and was opposed to any concession of power to Congress which might prove hostile to these views. Wherever this party prevailed paper money was emitted, the delay of legal proceedings was tolerated, suspensions of collecting took place. Where this party had not yet prevailed, the dread of getting the' superiority greatly affected the fortunes of a very considerable portion of the community. This uncertainty aided in promoting pecuniary embarrassments, which, at the time, influenced almost all the Legislatures of the Union. Public and private confidence was lost; the public debts due to individuals everywhere depreciated. In private transactions an astonishing degree of distrust prevailed. The bonds of solvent men could not be negotiated but at a discount of 30, 40, or 50 per cent. Real property was scarcely vendible. Sales of any article for ready money could not be made but at a ruinous loss. The debtor class of society might prove successful at elections, and instead of paying by the fruits of industry and economy, might be relieved by legislative interference. National wealth and national labor dwindled. Everywhere it was found that the people could not pay their debts. In some instances threats were used of suspending the administration of justice by private violence. 5th vol. of the Life of Washington, pp. 85, 89.
Amongst the various measures proposed for the removal of this gloomy state of things, a general convention to revise the circumstances of the .Union was one, and it succeeded. In Massachusetts, a short time before, the utmost distraction reigned. The mob required an abatement of the compensation promised to the officers of the army, a cessation of taxes and of the administration of justice; they required the circulation of depreciated paper, and a relief from public and private burdens. They *7 threatened lawyers and courts, arrested the course of law, and restrained the judges from 'doing their duty.
Rhode Island, a paper moneyed State, would not send deputies to the Convention, and North Carolina long hesitated in acceding to the federal Constitution. Such were the unpromising circumstances which America had to deplore, and such the alarming disorders, which were to be remedied by the Convention. One of the most powerful remedies was the tenth clause of the first article, and particularly the two sentences which we are now considering. They operated most efficaciously. The new course of thinking, which had been inspired by the adoption of a constitution that ivas understood to prohibit all laws for the emission of paper money, and for the making anything a tender but gold-and silver, restored the confidence which was so essential to the internal prosperity of nations.
There was a great and visible improvement in the'circumstances of the people. Conviction was impressed upon debtors that personal exertion alone could save them from embarrassment. An increased degree of industry and economy was the natural consequence of such an opinion'. These clauses, as they were not only necessary for the regulation of intercourse between State and State, and the citizens of each, to prevent the misunderstandings which were likely to arise from the prohibited causes, are equally so for regulating the intercourse of citizens of the same State with each other, were therefore considered as a fundamental law of the Union and also a part of the constitution of each State. What was it to the State of Vermont if Georgia should pass an ex post facto law or bill of attainder which could operate only upon those within her own territory ? The restriction was imposed upon Georgia, not for the sake of the people of Vermont, but for the benefit of Georgia and for fear of the tyranny which her own Legislature, at some future time, might be tempted to exercise. A law, impairing the obligation of contracts, as it was equally injurious to citizens of the same State as to foreigners and citizens of other States is equally prohibited as to all, and is not restrictive of State legislation only so far as regards citizens of other States. The constitutions of the several States had left the power unlimited in their State Legislatures. The framers of the federal Constitution believed it to be of indispensable importance not to leave this power any longer in the hands of the State Legislatures. Experience had demonstrated the baneful effects of its exercise. The known disposition of man excluded the hope that it would not be used for the same pernicious purposes in future. Under the smart of this experience, such were the feelings of the American people at the time, still suffering under repeated emissions of depreciated paper, that not a dissenting voice was raised against the clause before us. No State required it to be expunged, nor did any State propose an amendment. It was universally received without an exception, and the effects of the clauses *8 themselves were miraculous. Public and private confidence took deep root. The people of America were reinstated in the admiration of the world. The precious metals flowed in upon them. Paper money suddenly stopped in its career of depreciation and took a stand from which it never departed industry revived universally ; and to us in America was given a notable proof, that whenever a nation is virtuous and honest it will prosper both in wealth and character; and that whenever a contrary course is pursued, such is the wise decree of providence, that prosperity of either kind will not long follow in her train. ■
Do these acts of our Legislature revive any of the recited mischiefs ? If they are valid, what is there to distinguish our present situation from .that which preceded the federal Constitution ? Can our Legislature emit paper money and give credit to it by promising redemption by taxes and public property? Will not such money depreciate? Cannot the Legislature to every real purpose make it a tender ? And will not all the consequences ensue which followed the like causes heretofore, — payment of debts with depreciated paper, the dismissal of self-condemnation for unfaithfulness in contracts, a dereliction of industrious efforts, facility in the assumption of debts, a thirst for more paper, public inquietude under the ravages of speculation, indifference if not dislike to the Government, loss of public and private credit, the transportation of our commodities to countries where the money is not degraded, the removal of our capital thither, the cessation of active labor, the decrease of national wealth, poverty, embarrassment, open resistance to the laws, and a general cry as from a sinking ship of Save us! save us!
Part of the loss by depreciation falls upon every man through whose hand the money passes, and to avoid the loss as much as possible, every holder makes haste to get rid of it and makes some sacrifice to do so. Those to whom debts are due become debtors to an equal amount, to the end that what is lost by depreciation for debts due to them, may be saved by the depreciation of debts due from them. Many who are not debtors immediately become such by the purchase of property to as great an amount as possible, that they may gain as much in value as the sum to be paid to them loses in value by depreciation. Debts, instead of being extinguished, are multiplied, and the way is prepared for further emissions. Those who become creditors, knowing the risks they run, will have such advanced prices as will be a probable indemnification against them. A small number of .credits amount to immense sums, and the thirst for paper money increasing with the means taken to allay, it, new debtors clamor for more paper.. Wanting means, and laboring under the disadvantages inseparably incident to the paper money system, no State, however blessed by nature, can attain prosperity. Embarrassments incessantly multiply; *9 and for discharging debts without paying them, the country must be visited with misfortunes which no country can bear.
The injuries inflicted upon sister States will not be endured. The creditors there, when the attempt is made to pay gold and silver debts with depreciated paper, will seek redress; should the Constitution and laws of the Union be found inadequate-to afford it, the Legislature of their own State will look to its strength and to the dissolution of a compact which, instead of procuring justice to the citizens, excludes them from it. • Should the disappointed creditor be a foreigner, after .remonstrance to the head of the Union and the development of its incompetency, he will appeal to his own government and force will be resorted to. The whole Union becomes exposed for the injustice of one State, and will be disposed to leave it to suffer for its own misconduct rather than be responsible themselves for that which they cannot prevent. In either alternative, disunion- is the end. On the contrary, if the Constitution and laws of the Union make void such act of the Legislature, and we deem them valid, the debtor in this State will be bound to pay gold and silver to his creditor who lives out of the State; when, at the same time, his debtor within the State, who owes an equal amount, will pay in depreciated paper, perhaps of not half the value; and thus, one debtor residing within the State will be ruined by the legalized unfaithfulness of another.' And in our State Courts, the same words in the same clause mean one thing, but in the federal court another. When part of the citizens are thus sacrificed to suit the convenience of another part, and when such sacrifices become habitual by the frequent exercise of a power which never lies dormant, after the acknowledgment of its existence, it will not be long before the persecuted portion will seek exemption from the wrongs it endures. Such are the tendencies which the Convention meant to eradicate. Acts generative of such tendencies are adverse to the spirit of this clause, and there is a repugnance between them and the Constitution.
We come now to a more minute examination of the Acts in question.The creditor is denied execution for two years, unless he agrees to take paper. What the debtor cannot tender, the creditor is not bound to receive. Whatever he is not .bound to receive, he cannot be punished for refusing. The accessory is prohibited as well as the principal. Here the tender is not directly sanctioned. It is only said to the creditor, If you will not take paper, give up the means of getting anything at all for two years, with the prospect of still longer delay by repeated acts of the Legislature. Take this paper which I have no right to impose upon you, or give up a right which I have no authority to take from yon. Suspension of execution is a penalty, if, but for the Act, the creditor would be entitled to it as a right attached to his antecedent contract; and it is a penalty prohibited by the 10 th section now under consideration. If the Legislature *10 has power at this day to enact a suspension of execution for refusing to take paper, that section is abrogated. Two years may be extended to a hundred, and where is the difference between a direct injunction to take paper and the injunction to wait one hundred years, if he will not take it? Grant, for argument sake, that the right to execution is not an antecedent right attached to the contract, but a newly created one, given by the Legislature only upon condition; shall it be permitted so to frame the condition as to make it involve the relinquishment of a right secured by the Constitution ? By the latter, the creditor is secured against paper money. Can he be required to relinquish that security in order that he may become entitled to the benefit of this new created right, to have execution ? By such inventions every constitutional right may in succession be bartered away. Constitutional rights are vested, unexchangeable, and unalienable. They belong to posterity as well as to the present generation. We may use and enjoy, but not transfer them ; and every such condition is utterly void. If execution can be suspended on any condition, then the Legislature has an absolute power to suspend it forever. How easy it is to invent a thousand conditions, with which no man in his senses would comply! If the right is newly created and the condition void, it must vest without the performance of the condition; and the result is, that if the right be antecedent, suspension is an unconstitutional penalty; if it be newly created, the condition is unconstitutional, and the right vests absolutely. In either alternative, the indorsement need not be made.
This conclusion follows upon a correct interpretation of the clause prohibiting tender laws. It equally follows a just interpretation of the sentence prohibiting laws to impair the obligation of contracts, contained in Art. 1st, § 10, of the Constitution of the United States, and in Art. 11, § 20, of our Bill of Bights. A grant made by the State, being an executed contract, cannot be revoked by the Legislature if pursuant to a law made by themselves; this point is so decided in Fletcher v. Peck. With respect to executory contracts, it will be admitted without controversy that the terms and conditions of them cannot be in any respect altered or interfered with by the Legislature.
The time, place, person, or thing to be done, cannot be changed by act of Assembly. Covenants sometimes, by ex post facto circumstances, become unreasonably burdensome. He that covenants to pay rent for premises he never enjoys by the accidental burning of them, must nevertheless pay the rent. A man agrees to perform a voyage by sea under a penalty by way of stated damages for non-compliance, and he is hindered from an exact compliance by adverse winds, still he must pay the penalty. In these and all other cases of contract the Legislature cannot interfere to make them more just or reasonable than the parties have made them. For thus no contract could be made that the parties might depend on for fear of *11 the new modelling interposition of the Legislature. Thus far is plain ; but still the question remains, is the suspension of execution within the prohibition ? Does an Act to suspend execution impair the obligation of contracts made before it ? What the obligation of a contract is may be discerned by considering what it is that makes the obligation. The contract alone has not any legal obligation, and why ? Because there is no law to enforce it. The contract is made by the parties, and, if sanctioned by law, it promises to enforce performance' should the party decline performance himself. The law is the source of the obligation, and the extent of the obligation is defined by the law in use at the time the contract is made. If this law direct a specific execution and a'subsequent Act declare that there shall not be a specific execution, the obligation of the contract is lessened and impaired. If the law in being at the date of the contract give an equivalent in money, and a subsequent law say the equivalent should not be in money, such Act would impair the obligation of the contract. If the law in being at the date of the contract give immediate execution on the rendition of the judgment, a subsequent Act, declaring that the execution should not issue for two years, would lessen or impair the contract equally as much in principle as if it suspended execution forever; in which latter case the legal obligation of the contract would be wholly extinguished. The Legislature may alter remedies ; but they must not, so far as regards antecedent contracts, be rendered less efficacious or more dilatory than those ordained-by the law in being when the contract was made, if such alteration be the direct and special object of the Legislature, apparent in an Act made for the purpose. Though, possibly, if such alteration were the consequence of a general law and merely incidental to it, which law had not the alteration for its object, it might not be subject to the imputation of constitutional repugnance. The Legislature may regulate contracts of all sorts, but the regulation must be before, not after, the time when the contracts are made.
Our State Constitution, Art. 11, § 7, ordains “that all courts shall be open, and every man for an injury done him in his lands, goods, person, or reputation, shall have remedy by course of law, and right and justice administered without sale, denial, or delay.” This clause relates to every possible injury which a man may sustain and which affects him in respect to his real or personal property, or in respect to his person or reputation, and includes the right which is vested in him to demand the execution of a contract; which being a personal right to a chattel is, when performance is denied or withheld, an injury to him in his goods or chattels. And with respect to it right and justice is to be done, without sale, denial, or delay. In magna charta this restriction is upon royal power; in our country it is upon legislative and all other power. We must understand the meaning to be that, notwithstanding any act of the Legislature to the contrary, *12 every man shall have “ right and justice ’’ in all cases, “ without sale, denial, or delay.”
In 1796, when the Constitution was formed, it could not have been apprehended that any other department of government, except that of the Legislature, would ever have, weight enough to offer any obstruction. Experience from 1777 had fully demonstrated the imbecility of every executive office in the United States. From the executive no such offer could be anticipated. In 2d Institute, 55, my Lord Coke says the king is the speaker, and, in contemplation of law, is constantly present in all his courts, pronouncing the words of magna charta, “Nulli vendemus, nulli negabimus, aut differemus justitiamvel rectum’’' In Tennessee every Legislature is in contemplation of law during the whole session, and the judge of every, court during the whole term, in the constant repetition of the words “ right and justice” must be “administered without sale, denial, or delay.” In 2d Institute, 56, justice is said to be the end, and right the mean whereby we may attain the end, and that is the law. What that mean consists in is more specially explained in Sullivan, 523, where it is stated to be original and judicial process. Original process, he says, must issue without price except that which the law fixes, and without denial, though the defendant be a favorite of the king or government who interferes in his behalf, and must be proceeded on by the judges, after suit instituted upon it, without delay, themselves or by order of the king, or, as we say, act of the Legislature. And the judges where the causes depend must issue the proper judicial process, without fee or reward, except that fixed by law. In other words, where judgment is rendered the judges shall cause execution to issue, notwithstanding any order or act of Assembly or other pretended authority whatsoever.
This is the long fixed, well-known meaning and legal construction of the words right and justice without sale, denial, or delay. They clearly comprehend the case of executions suspended by act of the Legislature in every instance where justice requires that it should immediately issue; as it manifestly does where the law, operating upon the contract when first made, held out to the creditor the promise of immediate execution after judgment.
There is yet another part of our Constitution which some suppose takes from the Legislature the power to suspend execution. By our Bill of Rights, § 20, “ no retrospective law or law impairing the obligation of contracts shall be made.” This clause, taken in its common and unrestrained sense, extends to all prior times, persons, and transactions, whether civil or criminal; yet, certainly, there are some cases coming within its general scope to which it does not extend. It does not extend to ex post facto laws, for they are prohibited by the Bill of Rights, § 11. It does not extend to a law for extenuation or mitigation of offences, the remission of penalties or forfeitures. A present law may repeal a former one, or may enforce a contract heretofore made, or may make evidence a paper authenticated *13 according to its directions which was not evidence before, or may suspend computation under the Act of Limitations for a certain time past, during which a war existed, or no courts were in being; nor are laws void which give further time for the registration of deeds, nor for the disallowance of land .warrants unfairly issued ; nor divorce laws ; nor laws making allowances to members of Assembly, their clerks and door-keepers, after the service is performed. That the term retrospective has a very restrained meaning, is abundantly testified by the conduct of subsequent Legislatures and of the judicial tribunals of the country. In February, 1796, the Constitution was made; in March, 1796, the Legislature gave further time for the registration of deeds and made registrations under it as good and valid to all intents and purposes as if such deeds had been registered in proper time. Similar laws have been made in 1801, 1803, 1805, and almost at the expiration of every two years. These Acts have been frequently held valid by judicial determinations. The Acts of 1796, ch. 20, 1797, ch. 14 and 43, § 4, ch. 45, 1799, ch. 35, § 2, ch. 47, 1801, ch. 19,1807, ch. 85, are all of them restrospective in the most general sense of that term ; but they are of unquestionable validity. And what are the laws of 1801, ch. 24, 1803, ch. 25, 1805, ch. 4, for confirming administrations granted and marriages solemnized under the Franklin government, and for giving old verdicts the force and effect of judgments entered upon them ? In short, so many are the past transactions upon which the public good requires posterior legislation, that no government can preserve order, suppress wrong and promote the public welfare, without the power to do so. It is not withheld from any of the State governments, unless the present clause be an exception. Nor does the genius of free government demand that it should not be exercised, as it does, that the Legislature should not have power to pass, an err post facto law; because, with that engine, a dominant faction might spread destruction through the ranks of its political adversaries.
The laws of 1783, ch. 7, second 1794, ch. 13, 1803, ch. 1, § 5, were all of them restrospective in whole or in part, but were never deemed unconstitutional. All these and many other acts of the Legislature establish the truth of the position
that there are some, and indeed many eases in which retrospective laws maybe made. We have viewed with earnest attention the Bill of Rights, § 20, and have considered the inconveniences which any one interpretation will produce, and have finally settled down in this opinion that the word restrospective, as in the North Carolina and Maryland constitutions it is followed by explanatory words, so here it is explained by the words which immediately follow, “or law impairing the obligation of contracts,” and that the whole clause and both sentences taken together mean that no retrospective law which impairs the obligation of contracts, or any other law which impairs their obligation, shall be made, the latter words relating equally to both the preceding substantives; and, *14 therefore, that the term retrospective alone, without the explanatory words, can have no influence in this discussion.
There is yet another clause of our constitution which is said to militate against this act of the Legislature. Our Bill of Rights, section 8, declares : “ That no man shall be deprived of his property, &c., hut by the judgment of his peers or the law of the land.” Property is a thing in being which is capable of becoming the subject of dominion or ownership, and which actually has a master or proprietor, and is actually reduced into possession. Property in possession by this clause is secured to the owner, so that it cannot be taken from him but by due course of law in a court regularly constituted and proceeding by the standing rules of law; not by act of Assembly depriving the owner of it for the benefit of some other individual. The State has the eminent domain or ultimum, dominium over all the subjects of property in its territory, and may use it on urgent occasions for the public good, when in the opinion of the sovereign power, it is just and necessary so to use it. In the war of the revolution the government authorized impressments of all things necessary for promoting the great cause in which it -was engaged. This power of the Legislature, by section 21 of our Bill of Rights, is limited in its exercise, though not taken away : “ No man’s property shall be taken or appropriated to public use, without the consent of his representatives, or without just compensation being made therefor.”
The act of Assembly now under consideration takes away no property either for public or private uses, and is, therefore, not affected either by section 8 or section 21 of the Bill of Rights.
The result then of the investigation we have made is this, that suspension of execution as directed by these acts of the Legislature now under consideration, is forbidden by the prohibition of tender laws, as a direct consequence of the prohibition; also by the interdiction to pass laws impairing the obligation of contracts, suspension of execution being an impairing of such obligation; and furthermore, by the declaration that justice and right shall be done without delay in all cases, the process of execution being one sense of the term right, which is not to be delayed.
We are, therefore, bound to say that these Acts are repugnant to the Constitution and void, so far as relates to the suspension of execution ; and that execution ought to issue immediately without any such indorsement as the Act requires. The judicial tribunals of the country must refuse sanction to Acts which are to be executed through their agency; such as an act of suspension of execution is, which cannot take place without the assent of the Court. There are some violations which need not their instrumentality, and of course cannot meet their rejection, and which alone the great body of the people must correct. An occlusion of the Courts of justice would be one of them. The Courts cannot sit but on the days ap *15 pointed by the Legislature : and in that and other instances the Court haying no agency, would have no responsibility. Wherever their co-operation is unconstitutionally required, it is the most sacred of all their duties to withhold it, and whenever they are found to want firmness to do so, the Constitution and public freedom die together.
And here it is convenient to obviate an argument of frequent recurrence. The Assembly it is said have a right to suspend execution, because they may place the terms of the Court at such a distance from each other as to make it impossible for a creditor to entitle himself to execution in less than two, three, or more years, at the pleasure of the Legislature. The Assembly has power thus to fix the terms of the Courts, and a suspension of execution would be one of the consequences. The power to fix the terms, however, was not granted with a view to such consequence, but to the more easy and convenient administration of justice, consistently with the spirit of the Constitution, displayed in the section which requires that the Courts shall be always open for the redress of injuries. To fix the terms at a remote distance from each other for the purpose of producing an effect adverse to the spirit of the Constitution, would be to use the power of the Legislature for purposes not intended in the grant of it to them. It would be an abuse of power, — as much so as the suspension of the Courts themselves ; and certainly the legitimacy of an end produced, cannot be established by deducing it from an abuse of power; an abuse so alarming and so odious in its exercise that it never has been resorted to and perhaps never will be by the Legislature, unless when the calamity to be evaded, shall in the opinion and by the consent of all mankind, be more disastrous and afflicting than the means adopted for its prevention. The indignant disapprobation of the people is a corrective so powerful that it need not be aided by any auxiliary power in any co-ordinate branch of the government, but may be safely left, as the people have left it, to its own inherent energies. Whenever the people shall be ready to approve of such a measure, the adoption of it may be safely committed to the uncontrolled discretion of the Legislature. The power of the Legislature will then fairly flow in the channels which the contested argument opens for them, and not as at present, through others which the argument does not' pretend is open to them. The contested argument is unsound unless an illegitimate end, produced by a misapplication of power, can sanctify the like end produced by a direct infraction of the restriction imposed upon that power.
To be more explicit still; if a suspension of execution may be attained through the medium of the Legislative authority to fix the times and places of holding courts, it by no means follows that the same end may be attained, through the medium of a prohibited legislation upon contracts already made.
*16 It is proper, however, to remark in conclusion, that the same good faith which protects the .creditor against injustice, interposes a powerful veto against the subjection of the debtor to a greater burden than he has undertaken to bear. If he has specially contracted for payment to be made in bank paper, or if such was the meaning of the contract and the understanding of the parties at the time of its formation, it would be highly unconscionable in the creditor to enforce a payment in gold and silver, taking advantage of that extraordinary state of things which at this time pervades the western country, rendering a payment in gold and silver not only far more burdensome, but almost impossible and absolutely ruinous. The debtor ought to be heard to say, non in hese vincula, veni. There is a salutary rule in equity which ought to be applied under such extraordinary circumstances, and it is this: whatever a man hai a right to in conscience, and the' law has not fully provided for, equity will. 1 Fonb. 15 - 20. It is a rule which is the foundation in equity of all the precedents we now follow, and which have been established upon it. The immense and almost incalculable difference that at present exists in this State between specie and paper payments, justifies the application of this rule in its fullest extent, to obviate the injustice of creditors, who would enforce specie payments, instead of the paper ones which they agreed to receive. Such creditors by bill in equity and injunction, should be held to specific execution, and be compelled to receive what they stipulated to take, and not be allowed to ruin the debtor by calling for gold and silver. The precise contract ought to be complied with exactly as it was made, and the most perfect good faith be preserved on both sides. This relief ought to be confined to that species of bank paper which the contract specifies ; and when there is no such specification in the contract, should be extended to every species which is generally current in the State, the debtor making a proper allowance in all instances for the difference of value between one species and another that is generally current, and for the depreciation that has intervened since the day appointed for payment in the contract itself. The rule of equity must be applied that he who will have equity must do it. He who seeks relief against injustice must not do injustice, and wherever an injunction issues, security should be given to pay such sum as the Court shall finally decree.
These points to be sure are not before us for judgment, .and we mean no more than to intimate what at present are our general impressions, and to state in general terms the principles which I now think should be resorted to, leaving for future adjudication in each particular case that may occur, the particular relief which that case may require to effect justice according to its circumstances.
This is the opinion which I deem the proper one to be given on this question, and which, if it were entirely concurred in by Judge Emmerson *17 as it formerly was, I would now finally give, although Judge Whyte is not yet prepared to give his.
But as there is some part of this opinion which Judge Emmerson does not concur in, namely, that part which enforces paper money contracts specifically as made, it must therefore not be considered as final till it can be ascertained by the opinion of Judge Whyte whether in this point I am correct or not. For if I am so, then injunctions ought to issue whenever it shall be attempted to extort gold and silver in satisfaction of a paper money contract, which, however, cannot be issued with propriety and safety to the applicant before it is known by that opinion, whether such a course be a proper one or not. Under these considerations it seems better to wait for his opinion than to expose debtors to great losses without informing them of the means of- redress within their power, if any such there be.
Should injunctions issue before we are definitely informed upon this point, it might happen that five hundred bills might be filed and injunctions be issued upon them, all which would ultimately be found unsustainable, and be dismissed with costs to be paid by the applicants, after an illegal delay of execution for several months. Mischiefs so serious as these it is prudent to avoid, by conforming to the usual practice of courts, not to give judgment till all the members of the Court are ready with their opinions.
Original Note. — Judge Whyte did not express an opinion when the above was 'delivered, hut like motions having been made in the Supreme Court of Charlotte, that judge said he considered the question as settled, and joined in the orders.
Subsequently, when Judges Brown and Peek came to the bench, they uniformly, on sundry motions to the same effect, concurred in the above opinion; so that the expression of five judges on the bench of the Supreme Court has been in accordance with this opinion.